Filed 8/13/21  In re Ender H. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
## SECOND APPELLATE DISTRICT
### DIVISION THREE

| | |
|---|---|
| In re ENDER H., et al., Persons Coming Under the Juvenile Court Law. | B311003 |
| _____ | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 20CCJP04185A & B) |
| Plaintiff and Respondent, | |
| v. | |
| JOSE G., | |
| Defendant and Appellant; | |
| ENDER H., et al., Minors, etc., | |
| Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Lisa A. Brackelmanns, Judge.  Reversed.

Zaragoza Law Office and Gina Zaragoza, under appointment by the Court of Appeal, for Defendant and Appellant Jose G.

Lori Siegel, under appointment by the Court of Appeal, for Minors and Appellants Ender H. and Jacob H.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel for Plaintiff and Respondent.

---

The juvenile court sustained allegations of domestic violence and methamphetamine abuse against Jose G. (father) and asserted jurisdiction over his two sons, Ender H. and Jacob H. Although the juvenile court had returned the children to father's custody by the time of the disposition hearing, the juvenile court declared the children dependents, retained jurisdiction, and ordered family preservation services. Father and the minors now appeal the jurisdictional and dispositional orders. We agree there was insufficient evidence to support the jurisdictional orders. Accordingly, we reverse.

## BACKGROUND

I.    Report of neglect and investigation

The family consists of father, 10-year-old Ender, and eight-year-old Jacob. In mid-July 2020, the family came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) when it received a report they were living in an abandoned home without utilities. The property's manager told social workers that the house was going to be demolished so he let the family live there. Paternal aunt, her children, and paternal aunt's boyfriend also lived in the house; however, the house was divided into units, and she lived in one separate from father. Father and his sons had been living in the house for six to seven months. However, the home had no

2

electricity, gas, or running water.  The property manager said that the children were nonetheless well cared for, and he had no concerns about domestic or substance abuse.

Father explained that he had been homeless for two to three years.  He worked as a gardener.  The family used to live with the children's mother, but she was deported after attacking father with a knife in 2018.  Since then, father had been his sons' sole caregiver.  When father's motel vouchers ran out, he could not afford to pay for a motel.  He planned to get new vouchers once the house was demolished.  Due to his bad credit and immigration status, father had not been able to find an apartment and, although he had researched shelters, he did not feel comfortable sharing living spaces with strangers.

In their current home, father and the two boys shared a bedroom, which, although cluttered, was organized.  The utilities had been shut off for several weeks, but father got water from a fire hydrant, accessed electricity from a light post using extension cords, and used a portable stove and microwave to make food.  He kept a cooler for fresh food and bought tacos and food from McDonalds to feed the children.  They showered at father's workplace.  The children were current with immunizations and well-child examinations.  Father used cash assistance for food, basic necessities, and transportation.

Before the COVID-19 pandemic, the children had regularly attended school and an afterschool program.  Ender was a good student and had no problems, but Jacob misbehaved, and father had been advised to enroll Jacob in therapy.  But because father had to work, father had not wanted to commit Jacob to a program until father could ensure he could take him.  During the pandemic, father took the children everywhere with him, as he

did not want to leave them in paternal aunt's care.  Other family members either could not help or helped very little.

Father disciplined the children by verbally warning them or taking away their phones or outside playtime.  He denied using physical discipline.

The social worker interviewed Ender, who appeared developmentally and physically age appropriate.  His clothes were dirty as if he had been playing outside in the dirt, and his legs and knees were dirty, as if he had been sitting on the floor or running around.  Ender reported that his father did not physically discipline him, and he had never seen his father fight with anyone.  Ender knew about the incident between his parents but did not remember much about it.  Although DCFS had been told that paternal aunt's boyfriend had choked her, Ender denied seeing them fight.  Ender said that father did not use drugs or drink alcohol.  Ender also said that he liked where he lived because he was with his father and cousins.  He confirmed much of what father said about how they lived, including that he had enough to eat and was able to shower either at his father's workplace or at home.  Sometimes he could not sleep because he could hear rodents walking underneath the house.  Ender denied having any worries other than being forced to leave his home.  He liked his life, but he hoped to have his own room in a "regular house."

The younger child, Jacob, reported that he and his brother were never left alone without an adult, and sometimes they went to work with their father or stayed with their grandmother.  Jacob said he ate daily and confirmed that he either showered at father's workplace or at home using water from the fire hydrant.  He too liked where he lived and denied ever sleeping in a car or

on the street. Jacob could not remember any fighting between his parents, and he denied seeing any fights between paternal aunt and her boyfriend. He also denied that anybody in his home used drugs or subjected him to corporal punishment. He had no worries, and, when asked about his dreams, he said he wanted his own room and bed.

Jacob's teacher said that Jacob was intelligent and did his classwork but not his homework. Jacob was not malnourished but when he came to school dirty, she sent him to the nurse to clean up. Sometimes he came to school inappropriately dressed for the weather, so she gave him clothing the school had. Father was extremely difficult to get hold of, and he never answered his phone. The teacher had no concerns about abuse and did not suspect any drug use. However, she did not think Jacob was attached to father because Jacob never mentioned him. At the beginning of the pandemic, Jacob had been given a laptop on which to do his homework and Wi-Fi access, but he never logged on or completed his schoolwork. When the social worker asked father about Jacob not attending school, father admitted that he had "fail[ed]" to ensure Jacob attended school remotely but explained that he had to be at work when the children had to be in school.

Father's other sister told the social worker that father's problems began when mother was deported, and father had no place to live. Father and the children slept in his van until they got motel vouchers. The van was stolen from father, along with their property. The family had lived with father's sister for nine months, but when she became a live-in nanny, they moved into the abandoned house. Sister said that father ensured the children's needs were met despite his difficult circumstances, and

she had no concerns about neglect or substance or alcohol use by father.

Paternal uncle also reported that father took the children with him wherever he went. He too had no concerns about drug use.

Weeks after the social worker had first made contact with the family, they were still living at the abandoned house. When the social worker told father that his housing situation had to change, he said he would try to get motel vouchers but remained adamant about not going to a shelter, preferring to exhaust his resources before resorting to that option. Within a week of that discussion, father had moved his family into a motel.

The social worker also told father she was concerned that he used methamphetamine. Although father initially had denied using any substances other than an occasional beer, he later admitted he had first used methamphetamine in 2018 when he was working two jobs and needed to stay awake. He used it periodically, with the last time being four months earlier when the children were in school. But he denied using methamphetamine in front of the children or while caring for them. Father agreed to take a drug test, which was scheduled for July 23, 2020. That day, however, father confessed to the social worker that he had used methamphetamine on the 4th of July but hadn't wanted to tell her for fear of losing the children. The children were not present when he used, but he understood he had made a mistake. Father took a drug test on July 24, 2020, and it was positive for methamphetamine. When the social worker said that this result was inconsistent with father having last used on July 4, 2020, because methamphetamine does not

typically stay in the body's system for 20 days, father maintained that July 4 was when he last used.[1]

II.     Removal and petition

On August 6, 2020, DCFS removed the children from father's care. The social worker noted that when she first interviewed father on July 13, 2020, he had made eye contact with her and understood what she was telling him. But when she saw him on August 6, 2020, he had limited eye contact, sporadic rapid eye movement, and difficulty processing information. Even so, father's second drug test on August 4, 2020 produced negative results.

DCFS then filed a Welfare and Institutions Code[2] section 300 petition. The petition alleged under section 300, subdivisions (a) and (b), that mother brandished a knife at father in the children's presence, thereby endangering their health and safety and placing them at risk of serious physical harm. The petition further alleged under section 300, subdivision (b), that father historically and currently used methamphetamine and

---

[1] A toxicologist told the social worker that methamphetamine generally can be detected in the body's system for five days after it is used. Some people's systems remove it faster and others more slowly. While it was therefore possible that if father last took methamphetamine on July 4, 2020 it could still be in his system 20 days later on July 24, 2020, there was little chance that father's version of events was true. But the toxicologist could not rule it out without more information and testing.

[2] All further undesignated statutory references are to the Welfare and Institutions Code.

7

amphetamine and that the family lived in an unsanitary and hazardous home environment. The juvenile court detained the children and removed them from father. However, if father had four consecutive negative drug tests, the children would be released to him.

III.  Jurisdiction/disposition report and last minute information

Father continued to test negative for drugs, so the children were returned to him on September 4, 2020. The family was now living at a transitional housing facility.[3] Families generally may live at the facility for six months but that was increased to nine months due to COVID. The facility requires all adults to participate in on-site individual therapy, although that service is offered only in English, which father does not speak. The facility provides case management and life skills to help families find permanent housing. Father had enrolled in a finance class and was looking into a parenting class. The children were in the Boys and Girls Club.

Father also provided additional information about the 2018 domestic violence incident with mother. According to father, mother was angry because she thought he had brought pizza for only one child instead of the entire family. Mother tried to stab father, so he left the room to separate himself from her. Father either told the children to call the police or called them himself. Father said that although he and mother argued in front of the children, this was the only incident involving physical violence.

---

[3] Although the juvenile court's minute order of September 4, 2020 states that the children were released to father that day, a letter from the transitional housing facility stated that the family had been living there as of August 18, 2020.

8

The social worker spoke to mother, who admitted that she went after father with a knife because she was mad. However, the children were not present and found out about the incident when the police came. Mother was not aware that father used drugs, and she had no concerns that he neglected the children.

## IV. Jurisdiction and disposition hearings

### A. *Jurisdiction hearing*

At the contested December 2020 jurisdiction hearing, the family's case manager at their transitional housing facility testified that she had no concerns about father being under the influence of any illegal substance and, to her knowledge, he was not in a program to maintain sobriety. All families are drug-tested when they move into the facility, and father's drug tests continued to be negative. Father was not refusing services, and the children were well cared for.

The juvenile court denied father's motion to dismiss the entire petition, but it did dismiss the count alleged under section 300, subdivision (a), regarding serious physical harm due to domestic violence, and the count alleged under section 300, subdivision (b), regarding the family's living conditions. However, the juvenile court sustained counts regarding failure to protect due to domestic violence and failure to protect due to father's substance abuse. The juvenile court said that father had never addressed the domestic violence with mother and had thereafter exposed his children again to domestic violence by living with his sister, who was in a violent relationship. As to father's methamphetamine use, the juvenile court said that four months of clean tests were insufficient to give it confidence he would not use again when under stress. The juvenile court also

did not believe that father had last used on July 4, 2020, and honesty was part of sobriety.

B. *Disposition hearing*

The juvenile court held the disposition hearing in February 2021. Last minute information for that hearing indicated that father was enrolled in parenting classes but not individual therapy due to his work schedule. Father had housing referrals but no time to follow up on them. His weekly drug tests continued to be negative. Jacob was receiving mental health and wraparound services. Although father and the children's counsel asked the juvenile court to terminate jurisdiction, it instead declared the children dependents and ordered them placed with father in DCFS-approved housing. The juvenile court also ordered family preservation services and father to continue submitting to random drug testing and to attend parenting classes and individual counseling.

## DISCUSSION

I. Sufficiency of the evidence

Father contends there is insufficient evidence to support the jurisdictional findings of domestic violence and of substance abuse under section 300, subdivision (b). After setting forth the standard of review, we address the sufficiency of the evidence to support those findings.

A. *Standard of review*

Section 300, subdivision (b), provides that a child is within the juvenile court's jurisdiction if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability" of the

parent to adequately supervise or protect the child.  A challenge to the sufficiency of the evidence supporting jurisdictional findings and disposition orders under that section requires us to determine if substantial evidence, contradicted or not, supports them.  (*In re I.J.* (2013) 56 Cal.4th 766, 773.)  In making this determination, we draw all reasonable inferences from the evidence to support the juvenile court's findings and orders and review the record in the light most favorable to its determinations, while noting that issues of fact and credibility are in the juvenile court's province.  (*Ibid.*)  We do not reweigh the evidence or exercise independent judgment but merely determine if there are sufficient facts to support the juvenile court's findings.  (*Ibid.*)  We review the whole record in the light most favorable to the judgment to determine whether the record discloses substantial evidence such that a reasonable trier of fact could find the order appropriate.  (*Ibid.*)

> B.    *Sufficiency of the evidence to support the domestic violence allegation*

The juvenile court sustained the allegation that the children were at risk because of the 2018 domestic violence incident between mother and father.  Physical violence between parents may support jurisdiction under section 300, subdivision (b), if there is evidence the violence is ongoing or likely to continue, and that it directly harmed the child physically or placed the child at risk of physical harm.  (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 717.)  Past conduct can be probative of current conditions, but the question under section 300, subdivision (b), remains whether the circumstances at the time of the hearing subject the minor to the defined risk of harm.  (*In re M.W.* (2015) 238 Cal.App.4th 1444, 1453.)

*In r*e *Daisy H.*, *supra*, 192 Cal.App.4th at page 717, for example, involved a single incident of abuse by the father against the mother that had occurred several years before the petition was filed.  Other than this single incident, the children were healthy and well-groomed, the parents were separated, and there was no evidence the children were currently abused or exposed to abuse.  The juvenile court nonetheless found it had jurisdiction under section 300, subdivisions (a) and (b).  (*In re Daisy H.*, at p. 716.)  The Court of Appeal reversed and found the evidence insufficient to support a finding of past or present domestic violence that placed the children at a current substantial risk of physical harm.  (*Id.* at p. 717; accord, *In re M.W.*, *supra*, 238 Cal.App.4th at p. 1454 [single incident of domestic violence seven years before hearing insufficient to support jurisdiction].)

Similarly, in *In re Jonathan B.* (2015) 235 Cal.App.4th 115, 120, the father hit the mother when they were living together.  Five years later, they were no longer living together, but he hit her a second time when she was picking up things for the children.  (*Ibid.*)  This time she called the police.  This Division found that the evidence was insufficient to support jurisdiction, noting that the first incident was five years in the past, the parents were not together during the unforeseeable second incident, and the mother appropriately called the police after the second incident.  (*Ibid.*)  We therefore concluded that there was insufficient evidence the children were at substantial risk of suffering serious physical harm inflicted nonaccidentally by the mother or through her failure to protect them.  (*Id.* at p. 121.)

The case before us similarly involves one incident of domestic abuse that occurred two years before the petition was filed.  In that isolated incident, mother was the attacker; father

12

was the victim. Since then, mother has been deported and had only telephonic contact with the children. She therefore does not pose a current or future threat to them. Although the children were in the home during the incident, it does not appear that they witnessed it, and neither child could remember it when interviewed in connection with the petition. Further, when mother assaulted father in 2018, he responded appropriately by separating himself from mother and ensuring that the police were called. (See, e.g., *In re M.W.*, *supra*, 238 Cal.App.4th at p. 1454 [mother responded to incident by calling police and cooperating with them].) Father's steps to protect himself and the children undercuts DCFS's argument he is in denial about what happened or minimized it. Moreover, there has never been an allegation that father himself abused the children, and there certainly was no evidence of it. Thus, there is no evidence the children are at risk of current abuse or exposure to abuse.

Nor do we agree that paternal aunt and her boyfriend's allegedly abusive relationship is sufficient to fill the evidentiary gap. Father and paternal aunt lived in the abandoned home for a time but had separate living spaces. The family was no longer living with paternal aunt at the time of the jurisdiction hearing. Moreover, the children denied seeing any abuse. On this record, father's decision to live in the abandoned home cannot be characterized as exposing his children to domestic abuse within the meaning of subdivision 300, subdivision (b).

C. *Sufficiency of the evidence to support the drug abuse allegation*

The juvenile court's second ground for jurisdiction was father's alleged abuse of methamphetamine. To find an allegation true under section 300, subdivision (b), there must be a

showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future because of the substance abuse. (*In re Israel T.* (2018) 30 Cal.App.5th 47, 51.) In making this determination, substance *use* must not be confused with substance *abuse*. A parent's drug use alone cannot support juvenile court jurisdiction. (*In re Drake M.* (2012) 211 Cal.App.4th 754, 764.) This rule includes a parent's use of even "hard" drugs like methamphetamine. (*In re Destiny S.* (2012) 210 Cal.App.4th 999, 1003; *In re L.C.* (2019) 38 Cal.App.5th 646, 654; *In re Alexzander C.* (2017) 18 Cal.App.5th 438, 451.) Jurisdiction instead must be based on a parent's substance *abuse* and, further, that abuse must result in a risk of serious physical harm to the child. (*In re J.A.* (2020) 47 Cal.App.5th 1036, 1046; *In re Destiny S.*, at p. 1005.)

In *In re L.C.*, *supra*, 38 Cal.App.5th at pages 649 to 650, for example, the child's guardian tested positive for methamphetamine over about a two-week period and then had three negative tests. The guardian said he had used methamphetamine six or seven times, and when he did use, he stayed at a hotel away from the child and left the child with a dependable sitter. The guardian had no physical indicia of methamphetamine abuse, and the child was well cared for. The guardian ensured that the child attended all doctor appointments, took her to and from school, and helped her with schoolwork. The Court of Appeal reversed the juvenile court's order of jurisdiction under section 300, subdivision (b)(1), finding first that the evidence established merely that the guardian used, rather than abused, methamphetamine. He had used it at most seven times over a 10-month period, he did not crave or buy it, and there was no evidence he was under the influence when

14

performing caregiving tasks. (*In re L.C.*, at p. 652.) Second, the Court of Appeal found no evidence the guardian ignored parental responsibilities because of his occasional methamphetamine use. (*Id.* at p. 653; accord, *In re Rebecca C.* (2014) 228 Cal.App.4th 720, 727–728 [no evidence mother's drug relapse caused harm or risk of harm to child].)

As in *In re L.C.*, there is insufficient evidence in the present case either that father *abuses* methamphetamine or that any such abuse has caused or created a risk of harm to the children. Father admitted using methamphetamine in 2018 to stay awake so that he could work. He further admitted using it periodically, with the last time being on July 4, 2020. Father tested positive for methamphetamine on July 24, 2020, and based on that last test, the juvenile court was entitled to believe that father had used closer to that date. But even assuming that the last time father used methamphetamine was within a week of July 24, that fact is not sufficient to sustain a finding of methamphetamine abuse as opposed to mere use.

The social worker did not report seeing any drug paraphernalia in the abandoned home the family was living in when first contacted. Nobody—not the property manager where the family lived, father's extended family, the children, Jacob's teacher, mother, or the family's case manager at the transitional living facility—saw any evidence of substance abuse or had concerns about it. None of these people saw father use drugs or saw him under the influence of drugs. And although the social worker thought that father had sporadic rapid eye movement and difficulty processing information on August 6, 2020, when she removed the children from his care, father's August 4, 2020 drug

15

test came back negative, as did all weekly drug tests post-July 24, 2020.[4]

Nor does the record show that father was lying about his drug use in such a manner that a reasonable inference he was hiding an addiction could arise, as was the case in *In re K.B.* (2021) 59 Cal.App.5th 593, 601. In that case, mother denied drug use despite a positive test, admitted drug use only when pressed, made other inconsistent statements about her usage, went to bed at 5:00 p.m. every day, sometimes had to be awoken to take the children to school, tested positive during pregnancy for methamphetamine, had a prior arrest for possessing a controlled substance, and the family's pastor thought that mother had a history of drug use. (*Id.* at pp. 595–597, 601–602.) While father here did initially deny using methamphetamine and might have lied about when he last used it, the evidence in this case is nothing like that in *In re K.B.* Indeed, father *admitted* to the social worker that he had used methamphetamine in July 2020 and acknowledged his mistake. After his initial positive drug test, his weekly drug tests were all negative. This sparse evidence is in stark contrast with the extensive evidence in *In re K.B.*

In short, the evidence at most shows some drug use. It does not show use arising to the level of abuse. In addition, there is no evidence that the children suffered serious physical harm or were at substantial risk of suffering such harm because of father's substance abuse, as required by section 300, subdivision (b)(1). When the social worker first encountered father, he was

---

[4] Father missed one test in September 2020 because he had to pick up the children.

16

caring for the children under impossible circumstances and making rational decisions about their care. He, for example, took them with him to work when he could, improvised ways to provide water and electricity, ensured the children ate daily, and reasonably evaluated that the family was better off in the abandoned home rather than in a shelter. Before COVID, the children were attending school and an aftercare program. All persons interviewed indicated that the children were well cared for by father. The children themselves reported being adequately fed, provided for, and happy living with father. Father therefore maintained a job and cared for the children under incredibly stressful, challenging circumstances. No serious harm or risk of it is therefore shown on this record.

DCFS, however, suggests that father's drug use caused him to be homeless, which in turn created a risk of harm to the children. We agree with a general observation that drug abuse can contribute to homelessness. But no evidence supports such a link here. All that can be said on this record is poverty caused the family's homelessness.

We therefore reverse the jurisdictional findings for insufficient evidence. Accordingly, we also reverse the dispositional order. (See, e.g., *In re Roger S.* (2018) 31 Cal.App.5th 572, 583.)

## DISPOSITION

The jurisdictional and dispositional orders are reversed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

LAVIN, J.

EGERTON, J.

18